## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEBRALYNN MURDOCK<br>1154 Dublin Court,<br>Williamstown, New Jersey, 08094. | : | |
| | : | |
| *Plaintiff* | : | Civil Action |
| | : | |
| v. | : | COMPLAINT |
| | : | |
| Independence Seaport Museum.<br>a non-profit corporation<br>211 South Columbus Blvd. & Walnut<br>Street, Philadelphia, PA., 19106 | : | |
| | : | |
| *Defendant* | : | |

# COMPLAINT
# AND DEMAND FOR JURY TRIAL

Marc Orlow, Esq.
Begelman & Orlow
411 Route 70 East
Suite 245
Cherry Hill, NJ 08034
Phone: 856-428-6020
Fax: 856-428-5485

Table of Contents

I. The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A. Plaintiff Debralynn Murdock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B. Defendant Independence Seaport Museum . . . . . . . . . . . . . . . . . . . . . . . 2

        1. Defendant is a Public Body Under the Act . . . . . . . . . . . . . . . . . . . . 2

        2. The Museum's Board of Port Wardens . . . . . . . . . . . . . . . . . . . . . . . 3

        3. The Museum's Financial Operations and Board Resolutions . . . . . 5

        4. The Museum's Code of Ethics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        5. The Museum's Financial Reporting Must Comply with the
           Financial Accounting Standards Board . . . . . . . . . . . . . . . . . . . . 9

II. Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III. Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A. Wrongdoing by the Museum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        1. The Museum Violated FASB Standards, SOX,
           it's Own Board Resolutions and Ethics Code of Conduct . . . . . . . 11

        2. Plaintiff's Discovery of the Wrongdoing . . . . . . . . . . . . . . . . . . . . 14

        3. Plaintiff's Good Faith Reporting of the Wrongdoing . . . . . . . . . . . 17

        4. The Museum Board Meeting of December 19, 2017 . . . . . . . . . . . 19

        5. The Museum's Leadership Continued Wrongdoing . . . . . . . . . . . 21

        6. The Retaliation by the Museum . . . . . . . . . . . . . . . . . . . . . . . . . . 25

V. Cause of Action · Pennsylvania Whistle Blowers Law . . . . . . . . . . . . . . . . . . 26

Demand for Trial by Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Demand to Preserve Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

<u>I. THE PARTIES</u>

A.  Plaintiff  Debralynn Murdock

1.      Plaintiff  is Debralynn Murdock who resides at 1154 Dublin Court, Williamstown, New Jersey, 08094.

2.      Plaintiff brings this suit under the Pennsylvania Whistle Blower Law, 43 P.S. 1421 et seq. (hereinafter, the "Act") for Defendant's retaliation against the Plaintiff regarding the Plaintiff's compensation, terms, conditions and privileges of employment as a result of Plaintiff making good faith reports to her supervisors and other members of Defendant's senior management team regarding "wrongdoing" as defined in the Act and described herein.

3.      Plaintiff was employed as the controller by Defendant Independence Seaport Museum from  September 5, 2018 and was terminated on June 15, 2018. The terms of her employment consisted of a starting salary of $85,000 per year with a raise to $88,000 per annum after a positive three month review and all other benefits that were currently provided to Museum employees.  Plaintiff's duties and responsibilities included oversight of all finance, accounting and reporting activities as well as presentations to the Board Finance and Audit Committee and senior leadership team.

4.      Prior to being formerly hired by the Museum, Plaintiff was interviewed five separate times and was thoroughly "vetted" before being hired as the Museum's Controller, including completion of a clean background check.  These meetings included Brandon Maake (the controller that Plaintiff would be replacing), President/Chief Executive Officer John Brady, Chairman of the Board Peter Havens, Vice President of External Affairs Michele Blazer, and the Treasurer and head of the Board's Finance and Audit Committee, William Lane via conference

call.

## B. Defendant Independence Seaport Museum

5.     Defendant is Independence Seaport Museum, a 501(c)(3) non-profit corporation (formerly the Philadelphia Maritime Museum) located at 211 South Columbus Blvd. & Walnut Street, Philadelphia, PA., 19106 (hereinafter "Museum" or "Defendant").

6.     The stated mission of the Museum is to collect, preserve, display exhibits and interpret artifacts and archival materials, nurturing the skills and culture of the maritime past and present for a diverse public audience. The Museum executes this mission in the *public interest* through exhibits, educational programs, a research library and publications.

7.     The Museum operates a year round facility on the Penn's Landing waterfront with opportunities to visit the Cruiser Olympia and Submarine Becuna. The Museum was founded in 1960 as the Philadelphia Maritime Museum and serves approximately 110,000 visitors annually.

8.     The Museum as of 2017 had reported assets of approximately $28,406,239 dollars, income of $4,866,089 dollars, expenses of  $5,018,524 dollars and liabilities of $1,860,789 dollars.

### 1. *Defendant is a Public Body Under The Act*

9.     Defendant is a "public body" within the meaning of the Act in that under 43 P.S. 1422(3) they are:

> *. . . . any other body which . . . . is funded in any amount by or through Commonwealth or political subdivision authority . . . .*

10.     The Museum receives and has received over $180,000 dollars in government grant funds each year. In this regard, the Museum consistently receives funds, directly and indirectly, by and through the Commonwealth of

Pennsylvania, including but not limited to, (i) the Commonwealth's work/study program and Health Research Formula Grants for fiscal year 2005-06 from the Commonwealth's Department of State, (ii) grants from The Pennsylvania Historical and Museum Commission (PHMC), which is the official history agency of the Commonwealth of Pennsylvania and (iii) funds from the Commonwealth of Pennsylvania for the River Alive Project as recent as 2018. As examples, and not by way of limitation, these grants in the years 2012 through 2015 were as follows:

| | | |
|---|---|---|
| 2015 | $69,805.00 | Repairs to the hull of Olympia. |
| 2015 | $50,000.00 | Funding to support salaries for three full-time positions: 1) Director of Education; 2) Manager, STEM and On-Water Programs; and 3) Director, J. Welles Henderson Archives and Library. |
| 2014 | $13,857 | Repairs to the Becuna. |
| 2013 | $50,000 | Restoration of Olympia's after bridge deck, casement windows etc. |
| 2013 | $46,472 | Support administrative and operating expenses for Museum. |
| 2012 | $29,209 | Support administrative and operating expenses for Museum. |

### 2. The Museum's Board of Port Wardens

11.     The Museum is governed by a Board referred to formally as the Board of Port Wardens (the "Board"). Board Members must perform their duties in a manner they reasonably believe to be in the best interests of the Museum using the same degree of care, skill, caution and diligence that a person of ordinary prudence would use under similar circumstances. The Board, its members and senior management, have a fiduciary responsibility when managing finances and investments of the Museum.

12.     The Board acts through a series of Committees, including, inter alia, an Executive Committee, Finance and Investment Committee and Audit

Committee. The Flagship Olympia Foundation (the Foundation) is an affiliated not-for-profit organization formed in 2016 in which the Museum has control over and exercises general supervision over its operations. The Foundation's mission is to restore, preserve and improve the Olympia.

13.     During the time period relevant to this action, the Board, senior management and other relevant Museum personnel consisted of the following:

a. John Brady (Brady) is the President/CEO and Museum officer responsible for stewardship of the Museum.  Brady was also a ex-officio member of each Board Committee, including the Executive Committee, Finance and Investment Committee and Nominating and Governance Committees.

b. Michele Blazer (Blazer) is Vice President  of Development and External Affairs solely responsible for grants, contributions, charitable donations, funder relationships and external affairs related to support of revenue coming to the museum.  Blazer was also a member of the Nominating and Governance Committee. Blazer is responsible for both developing sources of income and revenue for Museum and providing estimates of what revenue could reasonably be anticipated. Blazer and members of her department are supposed to research, apply, and request from various organizations and other sources.

c. Carol McMahon, (McMahon) a staff accountant for Museum for 18 years previously employed as a accounts receivable clerk and was listed as the Museum's human resource manager.

d. William L. Lane III (Lane) is the Treasurer, a Board Member and is Chair of the Museum Board's Audit Committee.

e. Peter H. Havens, (Havens) is the Chair of the Board and Chair of the Executive Committee.

f. A. John Gregg (Gregg) is Chair of the Finance Committee.

g.  James W. McLane (McLane) is a Board Member, a former Treasurer, and is on the Finance and Investment Committee

h.  Peter Earnst (Earnst) is a Board Member and a member of the Executive Committee

i.  Tim McGrath (McGrath) is a Board member and member of the Executive Committee.

j.  Gay Waling, (Waling) assisted Blazer, in preparation of the grants when Ellen Fleurov the Grants Director was fired in Jan. 2017 by Blazer.

### 3. The Museum's Financial Operations and Board Resolutions

14.  At the time Plaintiff began employment on September 5, 2017, the Museum had only one operating checking account, in which all revenue received, (such as deposits, grants, contributions, donations, wire transfers of proceeds from sale of stock, income from programs, and admissions, etc) was deposited. This one operating account was also used for account payable checks, grant funded expenses and payroll. There was no separate accounts maintained for grant restricted funds

15.  The Museum has a total endowment of approximately $24,000,000 million dollars. As of June 30, 2017 the total endowment was reported to be $23,471,731 (hereinafter "Endowment Funds")

16.  The Museum's Endowment Funds were held in five (5) different investments account. Four of the investment accounts are with Fidelity Investments and are managed by Prudent Management (PMA) as "low risk" investment accounts.

17.  The Museum receives approval through a Resolution adopted by the Board each year to withdraw a maximum of four per cent (4%) from certain portions of the Endowment Funds to support Museum operating expenses when the flow of revenue from Museum operations can not support the needs of meeting day to day

expenses. This amounts to approximately $1,200,000 dollars. Each year, at the time the Board adopts a Budget, the amount of the authorized draw, along with the procedures to request a draw from the Endowment Funds is set based on the projected revenue and expenses.

18.   The Endowment Fund investment accounts consist of the following:

a.   Endowment (approximately $4.5 million). This account is used to receive Stock gifts that are either held or the shares sold and the proceeds are transferred to the Museum's operating bank account depending on the nature of the stock gift (e.g., annual board member donation, unrestricted gift) to be used however the Museum chooses, or a restricted gift towards an education program as an example.

b.   Restricted Endowment (approximately $11-12 million). This represents the bulk of the Museums Endowment Funds and is invested in low risk investments.

c.   Flagship Olympia Endowment (approximately $2 million). This account is for support, care, maintenance of the ship

d.   Boatshop Endowment (approximately $94,000). The Museum, as a registered boat builder with the Department of Homeland Security & United States Coast Guard, uses this account is to support the expenses related to boat building programs and education, but is not to be used on salaries.

e.   CACTI Investments (approximately $3.5 million) is managed as an "aggressive" fund. At the beginning of May 2018 the balance was approximately 5.7 million dollars. Once a year, in April or May, before the end of the fiscal year (6/30) this account is reviewed by the Investment Committee and a "true-up" of the dividends is transferred to the Museum's Restricted Endowment Fund account.

19.   At the time Plaintiff was hired, the Board had an outstanding

-6-

Resolution that detailed the management and procedures for withdrawing funds from the Endowment Funds, which required a written memorandum from the Controller (Brandon Maake at the time) that was to be approved by President/CEO Brady and then forwarded to Prudential Management Associates (PMA), the account custodian who would then wire funds from the Endowment Fund to the Museum operating account.

20.   The Board adopted a Resolution for detailing the management of these accounts holding the Endowment Funds, which provided that (i) any monies to be transferred in or out of the accounts must be authorized with a written memo requested by the Controller, and then approved by the President/CEO Brady and at least one additional signature of either Lane (the Treasurer) or Havens (Board Chairman). The authorized, signed memo is then sent to Kolby Mitnik or Richard Lerch at PMA who manages the accounts through Fidelity Investments.

21.   The Board adopted Resolution represents an internal control and procedure designed to ensure accurate financial disclosure to protect the public interest and the Museum as described in the Museum Code of Ethics (see below), it's inclusion of the compliance with the Sarbanes -Oxley Act of 2002 (hereinafter referred to as SOX) and the FASB Accounting Standards (see below).

### 4. *The Museum's Code of Ethics*

22.   The Museum Board formally approved and adopted an Ethics Statement (Code of Ethics) on December 19, 2013.

23.   The Code of Ethics as a general principle states the following:

> **Independence Seaport Museum collections, programs, and facilities are a *public trust*.** This must always be recognized by all persons associated with the museum, but primarily by persons having important responsibilities in formulating or administering policies and procedures governing the museum. **Persons holding such responsibilities have a duty and obligation to preserve and protect this *public trust*.** It is understood

that such duty may entail voluntary surrender of certain rights to personal privacy and economic activity; it is the goal of this ethics statement to preserve the public trust with the least possible sacrifice of personal rights. **Those individuals affected in varying degrees are Port Wardens, executive officers, employees, staff and volunteers of the museum.** [emphasis added]

24.     The Code of Ethics also commits the Museum and it's personnel to following the financial reporting requirements of SOX as follows:

While the museum is a nonprofit institution, it is cognizant of a nationwide effort, especially efforts through the Sarbanes-Oxley Act of 2002 to impose substantial and significant governance standards to increase the responsibility for public company boards of the records oversight in financial transactions and the auditor process. **Instilling so, the goal is to build and reinforce the public trust in the public corporate community. In keeping with this goal the museum has undertaken voluntarily in its ethics statements to *adopt and incorporate governance mis-practices engendered by Sarbanes-Oxley*[1]** [emphasis added]

25.     The Museum's Code of Ethics also commits the Museum and it's personnel to avoiding and disclosing conflicts of interest as follows:

CONFLICTS OF INTEREST

**The museum demands that all of its museum personnel conduct themselves with the highest standards of conduct and personal integrity, *to comply with all applicable laws and regulations and to conduct business in accordance with the letter, spirit and intent of all relevant laws and refrain from any unlawful, dishonest or unethical conduct.* Fundamental to these required standards is the avoidance of any conflicts of interest.** [emphasis added]

26.     The Code of Ethics also makes clear the financial oversight

---

[1] Under the Sarbanes–Oxley Act of 2002, 15 U.S.C. § 7241. Section 302 of the Act mandates a set of internal procedures designed to ensure accurate financial disclosure. Under Section 302, internal controls must be evaluated and have reported on. Any findings of deficiencies in the internal controls must be disclosed and reported on the financial statements of the organization.

responsibilities of the Board members, stating:

> **Board members hold the ultimate fiduciary responsibility for the museum and for the protection and nurturing of its various assets:** The collections and related documentation, the plant and financial assets, the collections and related documentation, the plant financial assets. They must develop and define the purposes and related policies of the institution and insure that all the museum's assets are property and effectively used for public purposes. [emphasis added]

> A responsibility of the Governing Board is the hiring of the chief executive officer/president of the museum and concurrent evaluation of the CEO and other museum executives in relation to the responsibilities outlined in their respective contracts.

> In addition the Board has the code of ethics as a specific whistleblower protection policy which states

> **Whistleblowers and others who make protected disclosures in good faith of improper conduct, financial or other improprieties related to the museum shall not be retaliated against in any manner, with the intent of adversely affecting the terms and conditions of employment or enrollment (including, but not limited to, threats or physical harm, loss of job, adverse or punitive work assignments, or impact on salary or wages) and shall be protected from such retaliation by the museum.** This protection from retaliation is not intended to prohibit supervisors or administrators from taking action, including disciplinary action in the usual scope of their duties and based upon valid performance related factors. [emphasis added]

The Code of Ethics adopted by the Museum represented a "code of ethics" as described in the Act designed to protect the *public interest* and the Museum.

### 5. The Museum's Financial Reporting Must Comply With The Financial Accounting Standards Board

27.   The Museum, in it's financial reporting must follow the Financial Accounting Standards Board *(hereinafter FASB)* Accounting Standards Codification® which is the source of authoritative generally accepted accounting

principles (GAAP) recognized by the FASB to be applied by non-governmental entities.

28.    The Financial Accounting Standards Board (FASB) is a private, non-profit organization standard setting body whose primary purpose is to establish and improve Generally Accepted Accounting Principles (GAAP) within the United States in the public's interest.

29.    The Securities and Exchange Commission (SEC) designated the FASB as the organization responsible for setting accounting standards for public companies in the United States. The FASB replaced the American Institute of Certified Public Accountants' (AICPA) Accounting Principles Board (APB) on July 1, 1973. FASB accounting standards are accepted as authoritative by many organizations, including state Boards of Accountancy and the American Institute of CPAs (AICPA).

30.    The FASB's mission is to "establish and improve financial accounting and reporting standards to provide useful information to investors and other users of financial reports and educate stakeholders on how to most effectively understand and implement those standards." The FASB carries out its mission through improving the usefulness of financial reporting, focusing on the faithful representation and relevance of financial information, including the enhancing characteristics of useful information, comparability, timeliness, understandability, and verifiability.

31.    FASB Accounting Standards Update 2016-14, Not-for-Profit Entities (Topic 958) Presentation of Financial Statements of Not-for-Profit Entities August 2016, requires enhanced disclosures about amounts and purposes of governing board designations, appropriations, and similar actions that result in self-imposed limits on the use of resources without donor-imposed restrictions as of

-10-

the end of the period and composition of net assets with donor restrictions at the end of the period and how the restrictions affect the use of resources.

32.  The FASB Accounting Standards for a not for profit such as the Museum represents a "code of conduct" as described in the Act for disclosure and reporting purposes that is designed to protect the *public interest* as well as the Museum.

## II.  JURISDICTION

33.  This Court has original jurisdiction pursuant to Title 28 Section 1332 in that this is a civil action between citizens of different States and the amount in controversy exceeds, exclusive of interest and costs the sum of $75,000.00 dollars.

## III.  VENUE

34.  The venue is proper in this District by virtue of Title 28 Section 1391(b) in that the Defendant resides in and is subject to personal jurisdiction in the District as a result of conducting substantial business in the District.

## IV.  FACTUAL BACKGROUND

### A.  Wrongdoing by the Museum

35.  The Act defines "wrongdoing" as follows:

> A violation which is not merely technical or minimal in nature of a **Federal or State statute or regulation**, of a political subdivision ordinance or regulation **or of a code of conduct or ethics designed to protect the interests of the public or the employer.** 43 P.S. § 1422 [emphasis added].

#### *1.  The Museum violated FASB Standards, it's Own Board Resolutions, SOX and the Ethics and Code of Conduct.*

36.  FASB defines an "Endowment Fund" as a fund of cash, securities or other assets to provide income for the maintenance of a not-for-profit entity (NFP). The use of the asset may be with or without donor imposed restrictions. Endowment Funds generally are established by donor-restricted gifts and bequests

-11-

to provide a source of income for a specified period.  Alternatively ,a governing board may earmark a portion of its net assets as a Board designated Endowment Fund.  The Board "earmarked," subject to specific conditions and an approval process, an amount not to exceed $1.28 million in 2016-2017 as available for withdraw to assist in funding operations as a donor imposed restriction.

37.   Endowment Funds were transferred without authorization, in violation of the Board Resolution, and were used to replace restricted grants funds received from, inter alia,  William Penn Foundation, Pew Charitable Trust, and PA Keystone Historical Museum Commission. These funds were improperly and illegally spent on general operating expenses. A summary of these illegal transfers is set forth below:

| DATE | WIRE AMOUNT |
|---|---|
| 3/10/2017 | 65,000.00 |
| 3/17/2017 | 125,000.00 |
| 4/3/2017 | 116,286.10 |
| 4/12/2017 | 105,000.00 |
| 4/18/2017 | 32,656.00 |
| 4/26/2017 | 95,000.00 |
| 5/10/2017 | 100,000.00 |
| 5/30/2017 | 90,000.00 |
| 6/15/2017 | 100,000.00 |
| 6/26/2017 | 110,000.00 |
| FY[2] 17 TOTAL | 948,942.10 |
| 7/14/2017 | 150,000.00 |
| 8/16/2017 | 125,000.00 |

[2] Fiscal year July 1, 2016- June 30, 2017

| | |
|---|---|
| 8/28/2017 | 2,437.94 |
| 8/29/2017 | 200,000.00 |
| 9/6/2017 | 200,000.00 |
| **FY 18 TOTAL[3]** | **677,437.94** |
| **FY 17 & 18 TOTAL** | **$1,626,380.04** |

38.     The Museum operated on a fiscal year basis from July 1 to June 30th of the following year. For the fiscal year July 1, 2016 to June 30, 2017, the Endowment Fund draws were made knowing that they exceeded the approved budget and Board's Resolution and were made without following the internals controls mandated by the Board Resolution. Furthermore, in violation of the Code of Ethics, FASB standards and SOX, these internal controls were not evaluated and the failure to follow such controls were not disclosed.

39.     The excessive draws on the Endowment Funds, as described above, started in March of 2017 when the grant funds had been spent and were being intentionally and fraudulently hidden with unposted journal entries that were "in suspense accounts" and posted entries that understated the Museum's true financial statements through the end of the June 30th FY close. These actions constitute "wrongdoing" under the Act in that they violated the FASB Accounting Standards, the Museums Code of Ethics, SOX and the Board Resolutions regarding the use of the Endowment Funds.

40.     The unauthorized Endowment Fund draws continued into the fiscal year commencing on July1, 2017 through June 30, 2018 (FY 18) and continued up through the beginning of September 2017, still being intentionally and fraudulently hidden with journal entries  posted and unposted to the general ledger. Doing so resulted in balances that were materially understated on both the Income

---

[3] Fiscal year July 1, 2017 through start of Plaintiff's employment on September 5, 2017

Statement and the Balance Sheet. All of this occurred prior to Plaintiff began working for the Museum on September 5th. These actions constitutes "wrongdoing" under the Act in that they violated the FASB Accounting Standards, the Museums Code of Ethics, SOX and the Board Resolution regarding the use of the Endowment Funds.

41.     The net restricted assets reported to the Board and the grantors (such William Penn, Commonwealth of PA, etc) were given false reports in that they were based on journal entries that showed expenses applied to grant restricted funds and a remaining balance of restricted grant funds held over in the Museums operating bank account, when in fact the funds were depleted. In fact, the day Plaintiff started on September 5th , the Museum's operating account was overdrawn. These actions, including the false reporting to grant funders constitutes "wrongdoing" under the Act in that they violated the FASB Accounting Standards, the Museums Code of Ethics, SOX and the Board Resolution regarding the use of the Endowment Funds.

### 2. Plaintiff's Discovery of the Wrongdoing

42.     Plaintiff started employment on September 5, 2017 and was informed that the previous Controller (Brandon Maake) left August 24, 2017 and would not be there for the transition or any "onboarding" assistance for Plaintiff as she assumed the duties of controller.  As a result, on Plaintiff's first day as Controller, she was faced with an operating account that was overdrawn thousands of dollars, with additional outstanding checks totaling over $250,000.

43.     In the months following Plaintiff uncovered, in addition to the above, numerous financial irregularities, malfeasance, violations of regulations, code of conduct and ethical violations related to the financial operation and management of the Museum along with numerous ethical and regulatory violations, all of which

-14-

were in place and designed to protect the public.  These included the following:

      a.  General ledger with unreconciled audit entries that resulted in incorrect financial information in the audited financials. This represented a deficiency in internal controls that was not evaluated or disclosed and represents of violation of ¶ 302 of SOX.

      b.  Spending of restricted grant funds for operating expenses. The operating account was the depository for all contributed revenue and was overdrawn on Plaintiff's first day. There was supposed to be an estimated $400,000 in William Penn River Alive Grant restricted funds for pending grant related expenses. This represented a violation of the FASB Accounting Standards as well as a deficiency in internal control that was not evaluated or disclosed and represents of violation of ¶ 302 of SOX.

      c.  Transfers from the Endowment Funds without the authorization or knowledge of the treasurer or chairman as the custodial Resolution states to pay for reckless departmental spending. This represented a deficiency in internal control that was not evaluated or disclosed and represents of violation of ¶ 302 of SOX.

      d.  President/CEO Brady and Vice President Blazer ignored reported Income Statement variances and inconsistencies on the financials that were reported to the Board Chair Peter Havens monthly and the Board quarterly for two years under the Controller Brandon Maake. This represented a deficiency in internal control that was not evaluated or disclosed and represents of violation of ¶ 302 of SOX.

      e.  Misuse of checks that were never mailed, including numerous instances of missing checks and checks out of sequence.  The Controller Brandon Maake authorized and printed checks that were never mailed to vendors.  The

checks were copied and used to falsely show that grant expenses were paid to validate the reimbursement submissions to the grant funding entities. This represented a deficiency in internal control that was not evaluated or disclosed and represents of violation of ¶ 302 of SOX, the Code of Ethics and the FASB Accounting Standards.

       f.      Unpaid grant expenses, and additional inaccuracies in the general ledger that went unnoticed and unreconciled by the Accountant Carol McMahon.  This was critical in that the Museum received grant reimbursements based on false reporting of payment of expenses related to each grant.  The restricted grant funds were spent on operating expenses, hidden with journal entries and falsely reported.  This represented a deficiency in internal controls that was not evaluated or disclosed and represents of violation of ¶ 302 of SOX, the Code of Ethics and the FASB Accounting Standards.

       g.      President Brady and VP Michele Blazer were fully aware that restricted funds were misused and chose to keep this information from the Board Chairman and the grant funders. This represented a deficiency in internal controls that was not evaluated or disclosed and represents of violation of ¶ 302 of SOX, the Code of Ethics and the FASB Accounting Standards.

       h.      Approximately $1,000,000 dollars worth of journal entries were posted in an attempt to hide the false information being reported to the Board and the grant funding organizations and agencies. This represented a deficiency in internal controls that was not evaluated or disclosed and represents of violation of ¶ 302 of SOX, the Code of Ethics and the FASB Accounting Standards.

       i.      Numerous tax delinquencies that were never addressed and ignored dating back to 2012. This represented a deficiency in internal controls that was not evaluated or disclosed and represents of violation of ¶ 302 of SOX, the Code

-16-

of Ethics and the FASB Accounting Standards.

j.     Emails from Michele Blazer to Brandon Maake instructing him to adjust the contributed revenue on the income statement to show inflated figures. This represented a deficiency in internal controls that was not evaluated or disclosed and represents of violation of ¶ 302 of SOX, the Code of Ethics and the FASB Accounting Standards.

k.     Witnessed Vice President Blazer initiated unauthorized transfers between the investment custodian and Museum's bank account with President Brady's approval.  This represented a deficiency in internal controls that was not evaluated or disclosed and represents of violation of ¶ 302 of SOX, the Code of Ethics and the FASB Accounting Standards.

These actions constitute "wrongdoing" under the Act in that they violated the FASB Accounting Standards, the Museums Code of Ethics, SOX and the Board Resolution regarding the use of the Endowment Funds.

44.     As a result of the above described unauthorized Endowment Fund transfers that were in excess of the Board mandated endowment allowance, there was by the end of September 2017 approximately only 400,000 was left of the 1.28 million allotted and by the time of the Board Meeting on December 19, 2017, meeting occurred, less than 150,000 remained.

### 3. Plaintiff's Good Faith Reporting of the Wrongdoing

45.     As a result of uncovering the above, Plaintiff, in good faith, made a series of reports as to what she uncovered, with the evidence, to President Brady, Vice President Blazer and the Chairman Havens in late September/early October. Plaintiff was instructed not to share the information with the Treasurer William Lane and not to share the unauthorized transfers with anyone on the Board because, as stated by Brady, *"it was better to avoid another scandal involving*

-17-

*misappropriated museum funds".*   Furthermore, they instructed Plaintiff not to share or repeat what she learned to anyone because *"it could jeopardize future funding."*

46.    In or about October 2017, shortly after reporting the above, Havens called a meeting with Plaintiff, Brady, Blazer and Richard T. Lerch of PMA, the Museum's financial custodian. In this meeting Havens was angry with the breakdown in internal controls and procedure laid out in the Board Resolution that required an authorized memorandum to initiate any transaction in or out of the custodial accounts. Havens told Lerch that if the process was not followed going forward that he and his firm would lose the account for mismanagement.

47.    Havens requested that new agreements for the custodial accounts be completed as well as an update of the memorandum that was the responsibility of the Controller to initiate. The new memorandum required the signature of the Controller, Brady and a second signature of either the Treasurer (Lane) or Havens for complete authorization to transfer any funds in or out of the Endowment Funds or custodial accounts.

48.    Despite the instruction from Brady, Havens and Blazer to not inform Treasurer Lane, Plaintiff began to confide in Lane in November 2017, advising him about some of the numerous financial irregularities, malfeasance with respect to maintaining proper internal controls, violations of regulations, code of conduct and ethical violations related to the financial operation and management of the Museum described above that she had uncovered. Lane told Plaintiff that he was available for advice, guidance and that she had his full support to get her job done. Plaintiff spoke to Lane frequently by phone in his office on his cell and also communicated by email.

49.    It took Plaintiff approximately three months (September through

-18-

November) to repair the damage done to the Museum that accrued over more than two years of fraudulent stewardship.  This included, inter alia, (i) reconciling and clearing $350,000 dollars in aging and open payables, (ii) revising the accounts payable policies (iii) creating the Museum's First Income Statement/Cash Forecast, (iv) filed tax returns for 2012, 2015, 2016 that were never filed, (v) revised the check policy to two authorized signatures, (vi) corrected a year long payroll error by Carol McMahon that resulted in all New Jersey residents missing State withholding, (vii) revised, amended and documented all Museum contacts, leases, agreements, resolutions, licenses and certificate of exemption, (viii) organized and documented the Drive Accounting Folder, grant fund expenses and (ix) updated the Human Resources policy and procedures. Last, in December 2017, after Plaintiff had uncovered the use of restricted grant funds to pay operating expenses, a second bank account was opened for deposit of restricted grant funds.  Thereafter, as a result of Plaintiff's diligence, when the Museum received restricted grant funds they were immediately transferred to the grant restricted account, from which an expense for a grant project was processed for payment the money for that expense was transfer out of the restricted bank account into the operating account.

50.    Plaintiff  was rewarded with $4,000 increase in compensation ($3,000 for satisfactory 90 days and additional $1000 to start a 6.5% early 401K participation) from Brady.

### 4. The Museum Board Meeting of December 19, 2017

51.    On December 19th, 2017, the Board held it's quarterly meeting to approve, inter alia, Museum finances. At this meeting, Lane, the Treasurer and Plaintiff presented to the Board a new version of Income and Cash Forecast Statement for review and approval.

52.    Previously, the Board would get an income statement that reviewed

current activity  compared to previous years activity of the same time period.  The new Income and Cash Forecast Statement report detailed current activity, detailed breakdown of restricted revenue, unrestricted revenue with a detailed breakout of expense by department, grant expense and project balances currently and forecasted forward with comments reflecting any significant changes that would or could drive the need for endowment draws.

53.    This new version of the Income and Cash Forecast Statement, developed by Plaintiff consisted of a detailed statement of Museum revenues, both restricted and non-restricted by grant, along with it's coordinated project, purpose and all expenses for each month going forward for the next 6 months.

54.    The need for the new Income and Cash Forecast Statement report was due to the unauthorized and improper draws from the Endowment that had exceeded the authorized sum with the year only half over as well as the mismanagement, numerous financial irregularities, malfeasance with respect to maintaining proper internal controls, violations of regulations, code of conduct and ethical violations related to the financial operation and management of the Museum that caused the need for excessive withdraws from the Endowment Funds .

55.    The presentation laid out a financial plan that would allow the Museum to function without the need to draw funds from the Endowment Funds to operate. The new financial plan included a strict schedule for managing account payables.  The Museum closed the month of December clean with payables and vendors current.

56.     Plaintiff received Board praise and thanks for the creation of a new model for schedules used to review the Income Statement and Cash Forecast of contributed revenue and coordinate expenses.

57.    In addition, Plaintiff was given "marching orders" by the Board to

continue managing the Museum's finances and execute the plan that Plaintiff presented and was approved by the Board on Dec. 19, 2017.

58.     Late in December 2017, the Museum received a unrestricted gift from Richard Hayne of $1,000,000 dollars (Hayne Gift) along with approximately. $1,800,000 dollars from William Penn & the Commonwealth of Penna in restricted grants for the next phase of the River Alive Project.

### 5. The Museum's Leadership Continued Wrongdoing

59.     Notwithstanding the above, almost immediately thereafter, things began to change.  In January of 2018 the Museum started to incur large expenses related to planned renovations that were largely paid for out of the Hayne Gift. At the time the Hayne Gift was received the Museum was in it's "down season" with very little operating revenue to support the day to day running of the Museum. During this period, Plaintiff started questioning what incoming revenue could be anticipated so that she could update the Board approved Income Statement and Cash Forecast for the remaining six months of Museum's fiscal year. This was a critical piece in managing the Museum's finances.

60.     Plaintiff asked Blazer who is responsible for both developing sources of income and revenue for Museum what revenue could reasonably be anticipated. Blazer and members of her department had the responsibility of researching, apply, and requesting grants, donations and sponsorships from various individuals, philanthropic organizations and corporations.

61.     Plaintiff learned that Blazer (Vice president of External affairs and Development) falsely reported to the Board a listing of grants applied for the 2018-2019 budget year.  The list contained grants that the Museum was not eligible to receive, missed application deadlines, and grantors who had already declined.

62.     Blazer and Plaintiff were supposed to meet, during the first week of

-21-

every month to discuss anticipated revenues for the purpose of updating the Income
Statement and Cash Forecast and report to Havens and the Board. Instead, Blazer
cancelled each meeting, ignored emails requesting information, refused to speak
with Plaintiff and became increasingly hostile and adversarial with each request.
The requests were for both grant and sponsorship information, and revenues to
support Museum operating expenses that Blazer and Brady told the Board would be
forth coming.

63.    Plaintiff again requested the same required information from Brady
and Blazer in February 2018 so she could prepare the financial schedules for the
Chairman's meeting, but requests for information from Brady and Blazer went
ignored and requests to validate incoming revenue went unanswered.

64.    Plaintiff became very concerned regarding the lack of incoming revenue
reported and in early February 2018, Plaintiff contacted Treasurer Lane. Plaintiff
explained to Lane that she wasn't getting the information required to accurately
prepare the financials. Plaintiff told Lane that with each request and attempt to
validate information Plaintiff was getting "push back" or no information from both
Brady and Blazer.

65.    In or about mid-March 2018, work began on the budget for FY 19.
Plaintiff still was not getting the information required to accurately prepare the
financials. Plaintiff had only received unvalidated revenue information that was not
sufficient for proper budgeting purposes.

66.    As a result of the above, a meeting was called by Lane to identify and
discuss the grants and other anticipated revenues being proposed on the budget
draft for FY 19 (July 1, 2018 - June 30, 2019). The meeting included Jamie McLane,
Plaintiff, Brady and Blazer. Lane and McLane pressed Brady and Blazer to provide
details and support for the revenue they reported on the budget draft so they could

be validated.

67.    Plaintiff expressed to Lane her growing concern that neither Brady or Blazer were concerned that the revenues they presented to the Board were not coming in and that, in the absence of those revenues, it was going to make it nearly impossible to stay on the schedule presented at the quarterly Board meeting in December.

68.    Lane thanked Plaintiff for entrusting him with the information and said that he would speak with other executive members of the Board discreetly on her behalf on the issues Plaintiff had raised.

69.    Lane spoke with Havens, McLane (Board Member on the Finance and Investment Committee) , and Ernst (Board Member and a member of the Executive Committee) who all supported maintaining the plan presented to the Board in December by Plaintiff in favor of the schedule presented to them in December. They all acknowledged that Plaintiff was justified in her  concerns for the Museum's finances and the lack of urgency from the President Brady and VP Blazer with regard to the lack of revenues that had been projected by them and presented to the Board in December 2017.

70.    Notwithstanding the foregoing, the actions of Blazer and Brady did not change.

71.    In March 2018 the Museum started to received board donations, and annual gift giving, some in the form of stocks that would be received and processed by the financial custodian PMA.

72.    Plaintiff then discovered that Blazer was bypassing the Board Resolution regarding Endowment Fund transfers. Plaintiff reported this to Lane by sending him a copy of the email from Blazer to the custodian instructing them to sell the stock and transfer the proceeds out of the custodial account and into the

-23-

operating account. Similar to the prior wrongdoing reported by Plaintiff, these actions also constituted "wrongdoing" under the Act in that they violated the FASB Accounting Standards, the Museums Code of Ethics, SOX and the Board Resolutions regarding the use of the Endowment Funds.

73.     Lane stated to Plaintiff that Blazer's actions and *"email was an egregious act"* and a *"clear disregard for the authority of the Resolution."* Lane contacted the custodian at PMA Richard T. Lerch by email, with a copy to Plaintiff and Kolby Mitnik of PMA objecting to the transfer.

74.     Blazer ignored the process and again emailed the custodian and Brady and instructed a transfer with her email serving as sufficient authorization.

75.     Lane also informed Havens of Blazer's disregard for the process.

76.     Plaintiff also sent an email directly to Havens reporting this wrongdoing. As a result, a conference call was held with Peter Havens, John Brady and Plaintiff. Havens adamantly told Brady that the Resolution must be followed, with the two signature memo was absolute for transactions regarding the custodial accounts and that process was the sole responsibly of the Controller, not Blazer.

77.     In the next months, even though Plaintiff tried to stay on course with forecast she shared with the Board, she continued to encounter resistance from both Brady and Blazer.  The flow of information ceased, and scheduled meetings for contribution information were cancelled. The Museum leadership was not working to stay within budget as it was forecasted.

78.     Plaintiff reported the continued wrongdoing to the Board. These actions, substantially similar to the prior wrongdoing that she reported, constituted "wrongdoing" under the Act in that they violated the FASB Accounting Standards, the Museums Code of Ethics, SOX and the Board Resolutions regarding the use of the Endowment Funds.

-24-

79.    Plaintiff shared with Treasurer Lane everything that she had discovered since becoming Controller, including the previous wrongdoing, the lack of the presidents stewardship, misuse of restricted grant funds, and unauthorized endowment transfers, fraudulent reporting to grant funders, all as described herein.

80.    Plaintiff was "thanked" for exposing the President Brady and Vice President Blazer's conduct.  Lane stated to Plaintiff that would address these issues and information and share them with Chairman Havens.

81.    Plaintiff continued to share her  concerns regarding the wrongdoing, and museum finances under the direction of the President/CEO and unvalidated grant contribution information from Blazer.

82.    Plaintiff emailed and spoke with Lane numerous times between January 2018 through May 2018.  Plaintiff  was told that the wrongdoing she reported would be addressed after the May 24-28 Tall ships Event.

### 6. The Retaliation By The Museum

83.    On June 15, 2018, Plaintiff was called to a 9 AM meeting with John Brady and Tim McGrath (Board member) and was promptly told, as a pretext for the retaliation, that she was being *"terminated for poor performance, the continued failure and warning to produce accurate financial information."*

84.    In  the presence of McGrath, Brady said *"he was tired of being blind sided with issues from things Plaintiff  shared*.  Brady stated *"I decided to do an additional background check"* and stated that Plaintiff was also being terminated for *"not having the required credentials for the job."*  Brady made this allegation even though at her interview she was told that her 20 plus years industry experience was exactly what the position required.

85.    Notwithstanding this claim, Plaintiff's job was given to Carol McMahon who is an accountant, (with out a CPA degree), and who was complicit in all of the

wrongdoing.

## V.  CAUSE OF ACTION

### PENNSYLVANIA WHISTLE BLOWERS LAW

86.    All the facts alleged in paragraphs 1 thru 85 are incorporated herein as if as if set forth at length.

87.    Plaintiff is an employee within the meaning of the Act in that Plaintiff was a person who performed a service for wages or other remuneration under a contract for hire, written or oral, expressed or implied for the Defendant who is a public body.

88.    The Defendant discharged and otherwise discriminated and retaliated against the Plaintiff regarding the Plaintiff's compensation, terms, conditions and privileges of employment, because Plaintiff made a series good faith reports to the Defendant regarding "wrongdoing" as defined in the Act and described herein.   .

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant and grant the maximum relief allowed by law, including, but not limited to:

.    Back wages, front pay, loss of fringe benefits, and raises in an amount to be determined at trial;

.    Compensatory, exemplary, and/or punitive damages;

.    Pre-judgment interest in an appropriate amount; and

.    Such other and further relief as is just and equitable under the circumstances;

.    Plaintiff's costs, disbursements, and attorney's fees incurred in prosecuting this action;

.    Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set

forth by applicable law. .

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury as to all issues.

BEGELMAN & ORLOW, P.C.

DATED: _9-28-18_

BY: _____
MARC M. ORLOW, ESQUIRE

### DEMAND TO PRESERVE  EVIDENCE

The Defendant is hereby demanded to preserve all physical and electronic information pertaining in any way to Plaintiff's employment, to her potential claims and her claims to damages, to any defenses to same, including, but not limited to electronic data storage, hard drive on her computer, employment files, files, memos, job descriptions, text messages, e-mails, spreadsheets, images, cache memory, payroll records, pay stubs, time records, time sheets, and any other information and/or data which may be relevant to any claim or defense in this litigation